UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


UNITED STATES OF AMERICA,)
                         )
   PLAINTIFF,            )        CASE NO. 2:18-cr-232
                         )
         vs.             )
                         )
MARCUS D. DUNN, ESQ.,    )
                         )
   DEFENDANT.            )
_____)


TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE MICHAEL H. WATSON
WEDNESDAY, MAY 1, 2019; 2:25 P.M.
COLUMBUS, OHIO

   FOR THE PLAINTIFF:
        Benjamin C. Glassman
        United States Attorney
        By:  Richard M. Rolwing
        Department of Justice, Tax Division
        303 Marconi Boulevard, Suite 200
        Columbus, Ohio 43215

   FOR THE DEFENDANT:
        Scott & Nolder Law Firm
        By:  Steven S. Nolder, Esq.
        65 East State Street, Suite 200
        Columbus, Ohio 43215
                                - - -


   Proceedings recorded by mechanical stenography, transcript
produced by computer.

LAHANA DUFOUR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
85 MARCONI BOULEVARD, ROOM 121
COLUMBUS, OHIO 43215
614-719-3286

2

1                            Wednesday Afternoon Session

2                                 May 1, 2019

3                                      - - -

4          THE COURTROOM DEPUTY:  This is case number

5  2:18-cr-232, United States of America versus Marcus Dunn.

6  Counsel, please enter your appearances.

7          MR. ROLWING:  Rich Rolwing for the United States, Your

8  Honor, joined by Special Agent Shawn Mincks.

9          MR. NOLDER:  Your Honor, I'm Steve Nolder on behalf of

10  Mr. Dunn who is seated next to me.

11          THE COURT:  Very good.  Good afternoon, gentlemen.

12          MR. NOLDER:  Good afternoon.

13          THE COURT:  Mr. Dunn, have you had more than ten days

14  prior to today's date to review the final presentence report

15  with Mr. Nolder?

16          THE DEFENDANT:  Yes, I have.

17          THE COURT:  We are here for sentencing today.  Are you

18  prepared to proceed?

19          THE DEFENDANT:  Yes, I am.

20          THE COURT:  18 United States Code Section 3553(a)

21  governs sentencing.  It informs me I'm to impose a sentence

22  sufficient but not greater than necessary after a consideration

23  of the statutory factors here that include the nature and

24  circumstances of the offense, your history and characteristics.

25  And I am thinking that based on what I've read about your

1   history and characteristics and the nature and circumstances of

2   this offense, they could not be more widely separated.

3       I've read letters from your father, from your mother,

4   from your wife and from your daughter, and they describe a

5   person who is a very committed parent, a loving husband, a

6   caring person who completely went off the rails.

7       I have a very thorough government sentencing memoranda.

8   I have an equally thorough defendant sentencing memoranda. I

9   have a presentence investigation prepared by David Ackerman.

10   Suffice it to say, I'm going to give the parties their benefit

11   of their understanding and we will compute the guidelines,

12   which are advisory, according to the tax computation

13   guidelines.

14       You pled guilty, Mr. Dunn, to corrupt endeavor to

15   obstruct or impede the due administration of the internal

16   revenue laws in violation of 26 United States Code Section

17   7212(a). It's a class E felony. You face no more than three

18   years in prison; no more than one year on supervised release.

19   You could be fined up to $250,000. You must pay a $100 special

20   assessment. Those are the statutory guidelines or the

21   statutory maximum sentence and fine and special assessment.

22       You are a 51 or 52-year-old gentleman?

23       THE DEFENDANT: I have to do the math, Your Honor. I

24   was born in '67. This is 2019.

25       THE COURT: You've got a birthday coming up.

4

```
 1          THE DEFENDANT:  I have a birthday coming up.

 2          THE COURT:  So you're still 51?

 3          THE DEFENDANT:  Exactly.

 4          THE COURT:  You have a JD but you've resigned your

 5   license, correct?

 6          THE DEFENDANT:  Yes.  That is correct.

 7          THE COURT:  I want to read for the record from the

 8   government's sentencing memoranda and then I want to read a

 9   portion of the defendant's sentencing memoranda into the

10   record.  I want the record to reflect that this matter involves

11   legal representation on behalf of Dr.  -- the late Dr. Kevin

12   Lake who I believe his son now stands charged with his murder;

13   is that correct?

14          MR. NOLDER:  Yes, sir.

15          THE COURT:  In any event, Dr. Lake was responsible for

16   a significant number of doses of opiates to southeastern and

17   southern Ohio over a period of some six to seven years.  He

18   operated a clinic in southeast Columbus or south Columbus.

19   Your involvement -- for a period of time you were at the

20   Schottenstein Zox and Dunn firm and I believe in 2002 you left

21   there.

22          THE DEFENDANT:  That's correct.

23          THE COURT:  And you joined the Zacks Law Group.  And

24   the Zacks Law Group then Mr. Lake or Dr. Lake was a primary

25   client or was perhaps the --
```

5

1    THE DEFENDANT:  One of the largest.

2    THE COURT:  The most significant client the firm had.

3    The Court has learned over the years to expect some hyperbole

4    from Mr. Rolwing.  I believe that we have some in the

5    government's sentencing memoranda, but I think it also aptly

6    describes the conduct here.

7    Dunn made the conscious decision to protect Dr. Kevin

8    Lake, DO, in two distinct ways.  In doing so, you were both

9    protecting your own livelihood and the livelihood of the other

10   partners in your firm.  Although, as it turns out, you didn't

11   share much in the benefits of that.  Dunn, along with others at

12   the firm, decided to remove Dr. Lake from the limelight as the

13   owner and operator of a pill mill drowning southern Ohio in

14   narcotics.  Dunn shielded Dr. Lake from scrutiny when the IRS

15   audited the Lake entity tax returns, and there were several, by

16   lying to revenue agents during audits about Lake's involvement;

17   lying to an attorney from the IRS Office of Chief Counsel in

18   the U.S. Tax Court litigation about Lake's role; and, lying to

19   a revenue officer during settlement collections about Lake's

20   participation.

21   In addition, you lied to many others to ensure that

22   Dr. Lake could have an exit strategy from his ownership of the

23   pill mill in the creation of the ESOP and the valuation of the

24   ESOP and the number of shifting numbers of what the value of

25   that ESOP or the entity supporting the ESOP really was.

1  Allowed Dr. Lake to squeeze an extremely-inflated valuation out

2  of the pill mill while purportedly selling it to the pill mill

3  employees, helping Dr. Lake sell the pill mill on paper and

4  letting Dr. Lake bleed millions of dollars out of the pill mill

5  before law enforcement executed a search warrant which had the

6  practical effect of closing the clinic.

7       You were not simply a lawyer who misunderstood the

8  complexities of Lake's criminal enterprise.  The government

9  would allege that you were instrumental in the functioning of

10  the enterprise; that you were not an unwitting cog in the

11  pill-prescribing machine.  You were instrumental in keeping the

12  machine grinding away at the fabric of southern Ohio.

13       For all of that, the government recommends that you

14  receive 30 months in prison.

15       Now I will read from the defendant's sentencing

16  memoranda discussing the nature and circumstances of the

17  offense at page 2.  Despite the government's hyperbole -- I

18  borrowed your word there, Mr. Nolder -- in its sentencing

19  memoranda, the crime for which Marcus Dunn will be sentenced is

20  not facilitating Dr. Kevin Lake's operation of a pill mill.

21  Dunn's conduct captured in his crime of conviction in no way

22  affected the day-to-day operation of Dr. Lake's medical

23  practice; instead, it impacted its tax liability.  This is the

24  lens through which Mr. Dunn's conduct should be viewed.

25       You go on to say that it deserves noting that many

7

1　months ago the government framed Dunn's criminal conduct in

2　paragraph 8 of the Bill of Information quoting Dunn did

3　corruptly endeavor to obstruct and impede due administration of

4　the internal revenue laws in the course of a civil audit and

5　other IRS proceedings of which he had knowledge by making

6　misleading misrepresentations to IRS revenue agents and IRS

7　attorneys.  That's the nature and circumstances of the offense.

8　　　　This Court is charged with considering and properly

9　computing the sentencing guidelines.  By my calculation, based

10　upon the numbers that you agreed to set forth in paragraph 4 of

11　part A in the presentence report, you agree to the statement of

12　facts set forth in attachment A of the plea agreement and to

13　the following advisory sentencing guideline factors, the base

14　offense level should be 18 pursuant to 2D1.1 and 2D1.4 because

15　the tax loss was between 250,000 and $550,000.  The actual tax

16　loss was $513,960.  The Court would then, therefore, assign a

17　base offense level of 18.

18　　　　The offense involved sophisticated means which results

19　in a two-level increase under 2D1.1(b)(2).  The defendant used

20　his special skill as an attorney resulting in a two-level

21　increase under sentencing guideline 3B1.3.

22　　　　Pursuant to 3E1.1(a) and (b), you're entitled to a

23　three-level reduction for acceptance of responsibility.

24　　　　So 18 and 2 is 20 and 2 is 22 and less the 3 makes it 19

25　and a criminal history category of I, I do believe.  You have

8

1    no prior convictions at all.

2         So a 19/I would net a 30-to-37-month sentence under the

3    sentencing guidelines and the government is asking for the low

4    end of the guidelines.

5         Mr. Ackerman had different numbers and ordinarily I

6    would side with my probation officer but I think because of the

7    complexity of this crime or this series of crimes, I think it

8    best to go with the agreement of counsel and so that's what

9    I've done.  It could have been a lower range of sentence under

10   the guidelines under Mr. Ackerman's computations.

11        Are there any objections to the Court's scoring of the

12   guidelines?

13        MR. ROLWING:  None from the government, Your Honor.

14   That is indeed what the parties agree to and how the government

15   calculates the guidelines.

16        THE COURT:  Very good.

17        MR. NOLDER:  I agree.

18        THE COURT:  Mr. Nolder, if you would care to make

19   statements in mitigation.

20        MR. NOLDER:  Thank you, Your Honor.  I think I would

21   first like to start off by addressing Mr. Ackerman's

22   recommendation.  And that is part and parcel of his

23   justification that's found in the presentence report.  I think

24   that's irrespective of the math that we used to compute the

25   guidelines, the accounting function of step one of the

1    sentencing process.

2        I think if you look at Mr. Ackerman's recommendation,

3    that is, a term of probation with a lengthy term of house

4    arrest with location monitoring, he believes and recommends

5    that that sentence is sufficient but not greater than necessary

6    simply because, one, it punishes Mr. Dunn for what he did; two,

7    that it deals with the specific and general deterrence aspects

8    of sentencing; and, three, that such a sentence wouldn't pose a

9    danger to the public.  So I guess I would start off with

10   highlighting that justification for Mr. Ackerman's

11   recommendation irrespective of the starting point of the

12   guidelines.

13       If we then move to is there a reason for departure?  I

14   think the parties agree there's not.  And Mr. Ackerman finds so

15   as well.

16       So then if you look at the 3553 factors that I'm sure

17   are going to guide your judgment in this case, you always have

18   to start off with the nature and circumstances of the offense.

19   We've kind of highlighted those.  I know that part of your

20   decision in determining the starting point under the guidelines

21   would have been the agreement of the parties that are part and

22   parcel to the plea agreement.  Everyone sitting at these tables

23   has fidelity to that agreement.  Otherwise, it would be a

24   breach of the plea agreement.

25       I would think that the same would transfer as to the

1 crime for which you're going to sentence Mr. Dunn. And there

2 should be some fidelity to the Bill of Information that the

3 government drafted. And in paragraph 8 of that Information, it

4 details, and all the subparagraphs that follow, it details the

5 crime and crimes that it believes Mr. Dunn committed and that

6 he freely admitted when he pled guilty some time ago. So I

7 would ask you to take a look at this case not through the lens

8 that the government may want the case to be looked at, but

9 through the lens of how the government has drafted the Bill of

10 Information and that Mr. Dunn has agreed.

11 And so it's a serious offense anytime anyone obstructs

12 or impedes the administration of any government agency. I

13 think that's true regardless of your station in life, whether

14 you're an elected official or whether you're a private citizen.

15 That is something that's out of bounds and shouldn't be done.

16 So we agreed that it's a very serious offense.

17 So then if you look at why this happened, and that's the

18 really difficult part of this is why did Marc Dunn risk

19 everything? Why did he risk his liberty? Why did he risk his

20 bar license? Why did he do this on behalf of Kevin Lake?

21 Because Dunn didn't run the operation day to day. He did

22 facilitate Lake's avoidance of taxes. That's true. And

23 they're now collected. That's true. But he didn't run the

24 pill mill.

25 And so if you look at some of the issues that permeated

 1   Marc Dunn's life at this period of time, whether it's the

 2   financial catastrophes that he was experiencing.  His house was

 3   in foreclosure.  He couldn't pay his daughter's private tuition

 4   bill.  He gets sued by CSG because he can't pay the bills.

 5   He's not making hardly any money for a 20-year lawyer at this

 6   firm and nonetheless -- and I reference some of the --

 7           THE COURT:  I would say it was a shocking number that

 8   he was making.

 9           MR. NOLDER:  -- some of the anecdotal data about

10   people that do this job and the level of dissatisfaction they

11   have in being lawyers.  And I think that that permeated Marc

12   Dunn and, believe it or not, he's relieved he doesn't have his

13   law license.  It's just stunning to me that someone could sit

14   through a three-day bar exam, suffer the misery of going to law

15   school and be liberated by having the law license taken away.

16   And he freely, the day after, I walked it down to the Ohio

17   Supreme Court and surrendered it.  So he's going through that

18   process.  It's not as easy as originally I thought it was going

19   to be but, nonetheless, he's done everything he can to

20   surrender it.

21           So that gives you some context and texture as far as why

22   this happened.  Doesn't excuse it.  But he's a person.  He has

23   failings and obviously he took the easy way out to keep the

24   firm client.  To keep the big goose in the firm, he did things

25   he shouldn't have done and compromised himself.  But that

1    doesn't have to be all Marc Dunn's about because we also know

2    that counterbalanced to the nature and circumstances of the

3    offense would be history and characteristics.  As you

4    referenced, they're exemplary.

5        He won the caprice of birth.  He won the caprice of

6    marriage.  In the sense of look at who his parents are, Harvey

7    and Margo Dunn.  They're here today, never thinking at all that

8    they would ever sit in a federal courtroom watching their son

9    being convicted and sentenced for a federal felony but they're

10    here.  They don't countenance what he did.  But yet he's their

11    son.  He's their only child and they're here to support him in

12    his hour of need.

13        He also won the caprice of marriage.  His wife, Sally,

14    she's here.  And they've been married 21 years.  She's related

15    to the named partner in the firm of the Zacks Law Group.  This

16    has been a very existentialistic voyage they've been on since

17    this has darkened Marc Dunn's doorstep.  Yet she's there with

18    him.

19        They do have a storybook marriage.  They're always

20    together.  They like being in each other's company.  There's

21    never been a hint of marital discord.  In that respect, that

22    bodes well for him as well.

23        His daughter couldn't be here, Halley.  She's a student

24    at NYU.  She's in finals so she's suffering through what finals

25    week presents to a college student, but she's going to be in

13

1   her final year next year at NYU.

2        And I think that those letters, and they're very

3   thought-provoking letters that his parents and Sally and Halley

4   wrote, I think give you some perspective of how good, as you

5   referenced, a son, a spouse and a father he is, and that adds

6   something and says something about him.

7        He's got letters from friends.  Anthony Lehv and

8   Jennifer Goldson.  Childhood friends known him all their lives.

9   And in their hours of need, any great dark chapters that we all

10  confront in our lives, who did they call upon to get through

11  that?  Marc Dunn.

12       His rabbi, Rabbi Berman, he was traveling in Israel when

13  he wrote me the e-mail to attach to the letter.  But he also,

14  he officiated at their marriage and he also spoke lovingly

15  about the things that Marc Dunn's done at the synagogue without

16  any hesitation whatsoever.

17       So that gives you some idea of what Marc Dunn is.  We

18  know the dark side that the government prosecuted and that's

19  part of the equation as well.

20       So then we look at, we know what the history and

21  characteristics are.  We know what the nature and circumstances

22  of the offense are.  Then what do we do about it?  What's the

23  appropriate punishment in the case?  And I know that

24  Mr. Rolwing is going to stand up and he's going to demand

25  prison and he's going to say that anything short of that is an

14

1    abomination.  And that rings clear and jumps off the page when

2    you read his sentencing memo.

3        You know what, he may have been right five or ten years

4    ago because our system -- that's what the effect was in our

5    system five or ten years ago.  But I think if you look at how

6    our views of punishment have evolved over the last year or two,

7    how the sentencing commission has approached punishment

8    differently, how Congress has approached punishment

9    differently, I think that there are alternatives that can

10   certainly act as punishment in this case and yet send a message

11   that this is unacceptable.

12       First of all, Mr. Ackerman's recommendation, the five

13   years probation.  Mr. Rolwing, undoubtedly, would say that's a

14   slap on the wrist.  That's not far enough.  But we know that if

15   you look at the *Gall* case, the Supreme Court decision where in

16   that case the sentencing range was also 30 to 37 months.  It

17   was a drug case.  And the District Court Judge in that case

18   imposed a sentence of probation.  The government appealed.  The

19   Eighth Circuit reversed; goes to the Supreme Court.  The

20   Supreme Court said it's a misnomer to think that probation is a

21   slap on the wrist because it is serious punishment.  It is an

22   actual deprivation of freedom in many ways.

23       Don't forget, this conviction can never be expunged.

24   Mr. Dunn will walk as a felon the rest of his life.  He'll live

25   with that stigma.  And he did surrender his bar license which

15

1   obviously was part and parcel that facilitated the commission

2   of this offense.

3        And finally, let's look at is the public at risk if some

4   alternative to incarceration is imposed?  And obviously

5   Mr. Ackerman, he weighed in on that.  He said that they're not.

6   Obviously that's your judgment in the end to make that

7   determination.  But if you look at all the studies that the

8   sentencing commission has authored over the last five years,

9   and you look at Marc Dunn's age, you look at what his crime of

10  conviction was, you look at the various issues that Marc Dunn

11  presents as far as criminal history category.  I don't think

12  even Mr. Rolwing could say that Marc Dunn presents a risk of

13  being a recidivist.  It simply isn't the case.

14       Finally, let's look at what's happened recently.  And

15  that's where I think the evolution of the beliefs in punishment

16  has really evolved.  And look at what Congress did just

17  December of last year, December 21st of 2018.  They promulgated

18  the First Step Act.  And in that Act, Congress has a directive

19  to the BOP that those inmates that are not predatory, those

20  inmates that do not pose a risk of danger to the public should

21  be considered for the lengthiest period of alternative to

22  incarceration possible.  They want to get people out of the BOP

23  that don't present dangers to the public.

24       Finally, let's look at what the sentencing commission

25  has said.  If you look at the most recent guideline amendment,

16

1    5F1.2.  In 5F1.2, the sentencing commission took a quantum leap

2    and it strongly encouraged judges to consider probation,

3    alternatives to incarceration for those inmates who aren't

4    violent offenders, who aren't predatory, who don't pose a

5    danger to the public, and that location monitoring is an

6    adequate form of punishment.

7          After considering all those issues, Your Honor, I would

8    ask you to implement Officer Ackerman's recommendation to

9    impose a sentence of five years of probation, to impose a

10   lengthy term of location monitoring and that way, sentence

11   would be not greater than necessary to satisfy Congress'

12   mandate.

13         THE COURT:  Thank you.

14       Mr. Rolwing.

15         MR. ROLWING:  Thank you, Your Honor.  As is clear from

16   the sentencing memorandum of the government, this is not a

17   crime that the government believes the Court should tell

18   Mr. Dunn to go to his room with no dinner.  That's what

19   Mr. Ackerman suggests and that is wholly inappropriate to the

20   criminal conduct Mr. Dunn engaged in over the course of years.

21         The fact that we agreed that he could plead guilty to a

22   7212 offense, a three-year offense, was an act of mercy by the

23   government given all the lies he told using his special skill

24   as an attorney in representing the man who was Dr. Lake and

25   during the course of all of the crimes he was committing.

17

1    There were a number of other offenses discussed and we, because

2    he's got great counsel, Mr. Nolder reached this deal on

3    Mr. Dunn's behalf limiting him to a term of 36 months, by

4    statute.

5         Because he also was able to convince Mr. Dunn to plead

6    guilty -- and that was no small task given the family

7    complexity and the men who were involved in the crime with him

8    that he refused to tell us any information about.  Because

9    Mr. Nolder was able to convince him to plead guilty and

10   acknowledge responsibility for his own conduct, the government

11   is here asking for the low end of the guidelines, as we do when

12   Defendants agree to plead and save the government resources.

13        But that's it, Your Honor.  Thirty months for his

14   conduct over so many years in helping Dr. Lake with this

15   premeditated plan over the course of years to exit, without

16   really exiting, in name only that pill mill and lying

17   throughout the course of it about the tax liability and the

18   audits that he was handling himself as his attorney, throughout

19   the course of those audits lying to the ESOP people that there

20   were no audits, there was no liability because he planned all

21   along to make sure Dr. Lake never paid that liability and he

22   knew how to get away with it at the end and deceive the IRS

23   because, quite frankly, he's very experienced in dealing with

24   the IRS.  That's his expertise as a lawyer.

25        He came up with the plan with his partners and he

18

1    executed the plan on behalf of his partner and his client.  And

2    unfortunately, he was -- they used him for that.  It's evident

3    he was used by Dr. Lake, by his partner, in the money they paid

4    him and the way they treated him.  But that doesn't excuse him

5    over years and years as a lawyer when you have someone you know

6    you want to do the right thing about.  This is a guy who's in

7    trouble, Dr. Lake, doing things that are causing

8    investigations, causing audits, causing all sorts of things

9    that he stepped over the line repeatedly throughout the course

10   of his representation with Dr. Lake.  Not just in helping him

11   draft fake bills of sale but lying and submitting those to

12   various parties.

13        And then the lens -- the reason why the government's

14   sentencing memorandum puts the full picture and asks the Court

15   to review his conduct in the lens we do is because Mr. Nolder's

16   lens is myopic.  Sure, he lied to the IRS.  Sure, he obstructed

17   their audit.  Sure, he obstructed their Tax Court litigation.

18   Sure, he obstructed their collection ability.  But that was all

19   part of the big plan to help Dr. Lake extricate himself with

20   all the funds from the pill mill and without that tax

21   liability.  And that tax liability would have never been paid.

22   By the time it was paid, it was only because the government

23   seized Dr. Lake's proceeds.  And by that time it was

24   1.1 million, I believe, that was paid off for those years

25   because of all the interest and penalties associated with that.

19

1       THE COURT:  The restitution, there is no restitution,

2  correct?

3       MR. ROLWING:  And I believe -- for the crime charged,

4  no.  Dr. Lake's proceeds we seized in 2000 I believe that

5  was '15.

6       THE COURT:  Paid past tax liability.

7       MR. ROLWING:  And all the penalties and interest.  And

8  for any tax liability I think Mr. Dunn owned individually,

9  which was pretty de minimis -- he's caught up with his tax

10  filings?

11       MR. NOLDER:  Yes.  I believe, Your Honor, that --

12       THE COURT:  There are a only couple of thousand

13  dollars.

14       MR. NOLDER:  On April the 18th, all of the returns

15  that he was tasked to file in the plea agreement were filed.

16  I'm sure there's --

17       THE COURT:  The 513,000 is taken care of?

18       MR. ROLWING:  Completely.

19       THE COURT:  All right.  Go ahead.  I'm sorry.

20       MR. ROLWING:  There is no restitution the government

21  requests nor is obligated to be paid.  What is and needs to be

22  paid for his conduct over the course of the years is a term of

23  imprisonment.  We ask the Court impose the term at the low end

24  of the guideline range, 30 months in prison.

25       THE COURT:  Thank you.

1    Mr. Dunn, you have an opportunity to speak in mitigation

2  in your own behalf, sir.

3    THE DEFENDANT:  Do you want me to walk up to the

4  podium; is this okay?  I'm not really good at impromptu

5  speaking so I made some notes if that's okay.

6    You know, I'm sure you're wondering why I did what I did

7  which was, as Mr. Rolwing has stated, corrupted -- corruptively

8  impeded the IRS on behalf of Dr. Lake.  It was for two sad

9  simple reasons.  One, I was trying to keep the firm's largest

10  client, Dr. Lake, happy so that he would remain a client of the

11  firm.  Something my partners wanted and regularly vocalized.

12  And two, even though I knew it was wrong, at the time of the

13  point in my life, I didn't have the strength to do what was

14  right.

15    I know what I did was wrong.  I knew that then and I

16  know that now.  And because of that, one of the things I did,

17  literally the day after I pled guilty in front of you, I did

18  the paperwork to give up my law license.

19    And you would think, and Steve kind of stole some of my

20  wind, you would think that after all those years of school and

21  tuition and in practicing law that there would be some thought

22  involved.  There wasn't any thought.  It was too easy because I

23  just wanted rid of that.  I wanted rid of what it put me under

24  and it felt like, as all of this, the way to break ties with

25  the past and move forward cleanly.

21

1       Like I said, there was no hesitation.  It felt so right.

2  It was a weight heavier than the world that was finally

3  removed.  The heavy burden that I carried all those years being

4  an attorney and doing what I did was removed.  It was done.

5       Now, now for once in my professional life as an employee

6  in my wife's brilliant business, I'm happy and not weighed down

7  by a heavy burden.  For once, I wake up ready to go to work.

8  I'm ready to help grow and assist her in her remarkable

9  business.

10      THE COURT:  What have you done about your depression?

11  And aren't you understating how that affected your conduct?

12      THE DEFENDANT:  I guess I am understating that.  I

13  didn't want to be expository upon how much it affected me.

14  I've not done anything at this point, admittedly, as to the

15  depression, but as part of what's going on now, I feel better.

16  I smile more.  I laugh.  Like I said, I enjoy waking up and

17  going to work.  And that's 24/7/365.

18      When I was working at the law firm, I couldn't wait for

19  the weekend to come.  I hated getting up in the morning.  I

20  couldn't get up in the morning.  I hated getting up in the

21  morning and going there.  And I couldn't wait for the weekend.

22  When I didn't have to go to the firm, didn't have to do

23  anything attorney related, didn't have to be with my

24  partners --

25      THE COURT:  Counsel, approach for a moment.

22

```
 1        (Thereupon, the following proceeding was held at sidebar.)
 2            THE COURT:     █████████████████████
 3            MR. ROLWING:   ████████
 4            THE COURT:     ██
 5            MR. NOLDER:    ████████████████████████
 6    ████████████████
 7            THE COURT:     ██████████████████████
 8            MR. ROLWING:   ███████████████████████████
 9    ████████████████████████████████
10            THE COURT:     ████████
11            MR. ROLWING:   ███████████████████████████
12    ████████████████████████████████████████████
13    █████████████████████████████████████████████
14    ████████████████
15            THE COURT:     ███████████
16            MR. ROLWING:   █████████████████████████
17    █████████████████████████████████████████████
18    █████████████████████████████████████████████
19    █
20            THE COURT:     ████████████████████████
21    █████████
22            MR. NOLDER:    █████████████████████
23            THE COURT:     █████████████████████
24            MR. NOLDER:    ████████████████████████
25    █████████████████████████████████████████████
```



24

```
 1        THE COURT:    ███████████████████
 2        MR. NOLDER:   █████████████████████████
 3   ██████████████████████
 4        THE COURT:    █████████████
 5        MR. NOLDER:   █████████████████████████
 6   ████████
 7        THE COURT:    ███████████
 8        MR. NOLDER:   ██████████████████████████
 9        THE COURT:    █████████████
```

10        (The following proceedings were had in open court.)

11            THE COURT:  I'm sorry.  Go ahead.

12            THE DEFENDANT:  I kind of went off script so I

13   apologize if I repeat some stuff.

14            Today, despite the outcome, regardless of the price I

15   must pay through today's sentencing, I and my family are ready

16   to move forward and start anew.  I look forward to going to

17   work every day.  I look forward to participating and watching

18   Sally grow her extraordinary business.  I look forward to

19   watching my daughter Halley graduate early from college next

20   year and I look forward to continuing to support her in

21   whatever she wants to do and be.

22            Regardless of what happens here today, I know that I

23   will be a contribution to society in a positive way with a

24   smile, a laugh and a balloon in my hand.  I have learned a lot

25   from this and it forced me to take a step that I couldn't

25

1  before because I did not have the courage.  Leaving the

2  practice of law and doing something that makes me happy makes

3  me proud and fulfilled.  I hope you can see that I'm not a

4  threat to society in any way and that I would never reoffend.

5  Thank you.

6          THE COURT:  So when does Halley graduate?

7          THE DEFENDANT:  Next May.

8          THE COURT:  Here's what we're going to do.  I'm going

9  to continue this until after Halley graduates.  In the

10  meantime, you're going to go see a mental health professional

11  and you're going to spend some time with a counselor talking

12  about all of the issues that are involved here.  There's a lot

13  of family involved here and you're taking the hit and you need

14  to think about that.  So sometime in June next year we'll be

15  back.  All right?

16          THE DEFENDANT:  Yes.

17          MR. NOLDER:  Thank you, Your Honor.

18          THE COURT:  That will be all.

19      (The proceedings were adjourned at 3:05 p.m.)

20                          - - -

21

22

23

24

25

26

1       C E R T I F I C A T E

2

3           I, Lahana DuFour, do hereby certify that the foregoing

4    is a true and correct transcript of the proceedings before the

5    Honorable Michael H. Watson, Judge, in the United States

6    District Court, Southern District of Ohio, Eastern Division, on

7    the date indicated, reported by me in shorthand and transcribed

8    by me or under my supervision.

9

10

11                    s/Lahana DuFour
                      Lahana DuFour, RMR, CRR
12                    Official Federal Court Reporter
                      August 16, 2019

13

14

15

16

17

18

19

20

21

22

23

24

25